771 So.2d 907 (2000)
K.D.G.L.B.P.
v.
HINDS COUNTY DEPARTMENT OF HUMAN SERVICES.
No. 1999-CA-00949-SCT.
Supreme Court of Mississippi.
October 19, 2000.
Rehearing Denied December 7, 2000.
*908 Richard L. Jones, Jackson, Attorney for Appellant.
Eileen A. Gault, Julia Ann Townsend, Jackson, Attorneys for Appellee.
BEFORE PRATHER, C.J., MILLS AND COBB, JJ.
MILLS, Justice, for the Court:

STATEMENT OF THE CASE
¶ 1. The Hinds County Department of Human Services (DHS) brought an action in the Chancery Court of Hinds County, Mississippi, to terminate the parental rights of K.D.G.L.B.P. (K.P. or the mother) as to two of her minor children. After a noticed hearing, the chancellor terminated the mother's parental rights, and she timely perfected her appeal to this Court.
ISSUES ON APPEAL
I. WHETHER THE CHANCERY COURT DENIED THE MOTHER DUE PROCESS BY NOT APPOINTING STATE-PAID COUNSEL IN A TRIAL TO TERMINATE HER PARENTAL RIGHTS.
II. WHETHER THE CHANCERY COURT ERRED BY TERMINATING THE MOTHER'S PARENTAL RIGHTS.

FACTS
¶ 2. K.P. is the natural mother of four children. Two of the children, Jack and Jill (fictitious names), are at issue in the present matter. Jack was born on May 21, 1988, and Jill was born on February 15, 1994. Jack and Jill have different biological fathers, both of whom have had very little or no interaction in their lives.
¶ 3. In both January and July of 1994, unsubstantiated abuse referrals on K.P.'s family were conducted which revealed an atmosphere of domestic violence. On March 27, 1995, Jack and Jill were first placed within the custody of the Department of Human Services (DHS) by order of the Hinds County Youth Court. Based on evidence that the mother was homeless, the Youth Court determined that the children were neglected and ordered them into DHS custody "until such time as the mother secures adequate housing for the children and herself." At the time the children were removed from the home, Jack was six years old and Jill was one year old. Although DHS proposed a case plan, the mother refused to sign it because she felt it required conditions beyond those set forth in the Youth Court order.
¶ 4. On October 30, 1996, DHS filed its petition to terminate the mother's parental rights. The mother obtained the pro bono legal services of a Jackson attorney who agreed to help resolve the termination of parental rights proceedings. That attorney negotiated a case plan with DHS, which was signed by the mother on May 29, 1997. Although the mother substantially met all the conditions set forth in the plan, she failed to complete the individual and family counseling, stating it was "a big, big, big waste of my time, gas, my energy and my efforts." Instead, the mother sought her own counseling through various religious leaders.
¶ 5. The mother was homeless during the 18 months her children were in foster care. She lived in an abandoned apartment with no running water and no electricity. She stated that she was homeless because God had told her that he was going to use her as a street minister.
¶ 6. In December of 1997, a favorable home study was done, and she regained temporary custody of her son, Jack. She *909 also regained temporary custody of her daughter, Jill, in May of 1998. The mother and her new husband then left Mississippi with the two minor children on what the mother described as a "vacation trip" to Florida. A few days later, she called her social worker, Elsie Roark, to report that the family was in Florida and asked if it was possible for them to stay there. Roark told her that she should not have left Mississippi without court approval, but agreed to see if it was possible for them to remain in Florida. As part of the agreement, Roark arranged for a home study to be done by the Florida Department of Children and Family Services. Before the home study could be conducted, however, the mother was arrested for stabbing her husband with a paring knife. Although the Florida social worker found the accommodations to be adequate, she denied placement of the children with the mother because of her concern regarding the mother's mental state and the violent incident. Florida authorities removed Jack and Jill from the home and returned the children to the custody of DHS in Hinds County, Mississippi.
¶ 7. A trial on DHS's petition to terminate parental rights was set for Monday, January 11, 1999. Three days before trial, on January 8, 1999, the mother's pro bono attorney withdrew as her counsel. The mother appeared pro se at trial. On February 10, 1999, a final judgment was entered terminating the mother's parental rights with respect to Jack and Jill. Aggrieved by the chancery court's decision, the mother timely perfects this appeal.

STATEMENT OF THE LAW

I.

WHETHER THE CHANCERY COURT DENIED THE MOTHER DUE PROCESS BY NOT APPOINTING STATE-PAID COUNSEL IN A TRIAL TO TERMINATE HER PARENTAL RIGHTS.
¶ 8. The mother asserts that she was deprived of "the right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution" when the chancery court failed to appoint an attorney to represent her in the termination of parental rights proceeding. DHS, however, argues that she was not denied any due process rights.
¶ 9. At trial, the following dialogue took place between the chancellor and the mother concerning the mother's not being represented by counsel:
THE COURT: Okay. Are you representing yourself today?
K.P.: The Lord is my defense.
THE COURT: Okay. So you do not have an attorney?
K.P.: That's correct.
THE COURT: Okay. And do you understand that this is a petition to terminate the parental rights, your parental rights
K.P.: Yes, ma'am.
THE COURT:of two minor children?
K.P.: Yes, ma'am.
THE COURT: And you wish to represent yourself today. I know that the attorney, Mr. Silberman, has withdrawn as your attorney.
K.P.: Yes. He doesn't know much about these type of cases, and he had originally taken the case to get my house back, and when the Department of Human Services filed the Termination of Parental Rights, he dropped the housing case and picked up this case, and it has been prolonged. And he was doing it pro bono, so he decided to withdraw.
THE COURT: Okay. And you have not sought other counsel?
K.P.: I don't live in this state, and it was impossible to do that.
THE COURT: Where do you live now?
K.P.: In Florida.

*910 * * *
THE COURT: Mrs. Marshall then, will present her case first. You will have the opportunity to ask any questions we call that cross-examination of her witnesses, or the Department's witnesses, when she finishes questioning them. After she presents all of her witnesses and evidence, then you'll have the opportunity to present whatever you have in response to that, and then the Court will make a decision. Do you have any questions?
K.P.: I'm not familiar with this proceeding, but if you could just help me through it.
THE COURT: All right. So you might want to take notes, and that's why I mentioned you'd have the opportunity to ask questions or you might want to make a point about something you heard during the testimony, so if you have a pen and pencil, that might help you.
¶ 10. DHS asserts that since the mother "did not ask for a continuance or additional time to seek substitute counsel" that she was not denied her due process rights. DHS further argues that she was not denied due process because she "never even alluded to the fact that her financial condition might have precluded her from being able to retain counsel" until post-trial motions.
¶ 11. In Lassiter v. Department of Soc. Servs., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the United States Supreme Court addressed the issue of whether an indigent parent is entitled to appointment of counsel in a termination of parental rights proceeding under the Due Process Clause of the Fourteenth Amendment. In Lassiter, the lower court had transferred custody of the infant son from the mother to the Durham County Department of Social Services because the child had been adjudicated neglected. One year later, the mother was convicted of second-degree murder and began a 25 to 40 year prison sentence. The mother was served with a petition and notice that a hearing on the termination of her parental rights would be held. At the request of social services, the mother was brought from the prison to the hearing. Although the mother had obtained counsel for the murder conviction, she never mentioned the termination hearing to that counsel or sought any other counsel. Consequently, the mother was not represented by counsel at the hearing. The hearing opened with the trial judge discussing whether the mother should be allowed more time to obtain legal counsel. The trial judge concluded that she "had ample opportunity to seek and obtain counsel prior to the hearing" and did not postpone the proceedings. Id. at 21-22, 101 S.Ct. 2153.
¶ 12. The United States Supreme Court upheld the decision of the trial court and specifically emphasized that the "the petition to terminate parental rights contained no allegations of neglect or abuse upon which criminal charges could be based; no expert witnesses testified; the case presented no specially troublesome points of law; [and] the presence of counsel could not have made a determinative difference for petitioner." Id. at 19, 101 S.Ct. 2153. One of the most important factors to be considered in applying the standards for court appointed counsel is whether the presence of counsel would have made a determinative difference. The Lassiter decision thus states that appointment of counsel in termination proceedings, while wise, is not mandatory and therefore should be determined by state courts on a case-by-case basis. Id. at 34-35, 101 S.Ct. 2153.
¶ 13. The record is replete with many instances indicating that the mother has deep psychological problems that demand attention. Paul Davey, an expert psychotherapist, stated that she suffered from "psychological problems" and found that:
Her scores were similar to individuals who are angry, belligerent, rebellious, resentful of rules and regulations and *911 maybe hostile to authority figures. Such individuals are likely to be impulsive, unreliable, self-centered and irresponsible. They typically have little regard for social standards, have poor reasoning and judgment, difficulty planning ahead and difficulty benefitting from previous experience in life.
Furthermore, the trial testimony indicates that the mother has suffered from "situational depression" since the early 1980's. Throughout the trial the mother was unable to admit that she was responsible for her children being taken away. She consistently refused to accept fault for not providing a physical home for a period of over 18 months so that she could get her children back. She acknowledged that she was capable of working, but failed to provide any proof that she has actually worked throughout the years that the children have been in foster care. Her alleged employment sources could never be verified, despite the diligent efforts of DHS and Paul Davey. Although the mother may have been diagnosed with depression and other psychological problems, these illnesses do not amount to mental incompetency which would have precluded her from understanding or assisting in a defense at trial.
¶ 14. Although there is no statute or case law in Mississippi on the question of whether an indigent parent is entitled to counsel at a termination of parental rights proceeding, the Supreme Court in Lassiter stated that the appointment of counsel should be determined on a case-by-case basis. In examining the facts of this case, we find that the mother was granted a fair and adequate hearing. She was given ample notice of the proceeding in time for her to secure suitable counsel. At trial, she never asked for a continuance or for additional time to seek substitute counsel. Instead, she signified to the court that she intended to represent herself and that she was ready to proceed. Furthermore, on the day of trial, she did not even allude to the fact that her financial condition might have precluded her from being able to retain counsel. This argument was only raised in post-trial motions. Finally, the evidence supporting the chancellor's decision to terminate the mother's parental rights was so overwhelming that the presence of counsel would not have changed the outcome of the trial. Although the termination of parental rights is a serious judicial proceeding, a review of the record indicates that the chancellor's actions ensured that the mother was provided a constitutionally adequate hearing as guaranteed by the Fourteenth Amendment.

II.

WHETHER THE CHANCERY COURT ERRED BY TERMINATING THE MOTHER'S PARENTAL RIGHTS.
¶ 15. Miss.Code Ann. § 93-15-109 (Supp.2000) sets forth the standard to be applied in the termination of rights of unfit parents as follows:
After hearing all the evidence in regard to such petition, if the chancellor, family court judge or county court judge is satisfied by clear and convincing proof that the parent or parents are within the grounds requiring termination of parental rights as set forth in this chapter, then the court may terminate all the parental rights of the parent or parents regarding the child, and terminate the right of the child to inherit from such parent or parents. The termination of the parental rights of one (1) parent may be made without the parental rights of the other parent, should circumstances and evidence ever so warrant.
(emphasis added). The mother asserts that "there was not clear and convincing evidence to support a finding that she had so failed to comply with DHS's requests that it was impossible to return custody of the children to her." DHS, however, argues that clear and convincing evidence was presented to the court and that the best interests of the children were served *912 by terminating the mother's parental rights. We find that the chancery court properly terminated the mother's parental rights.
¶ 16. To best illustrate the circumstances surrounding this case, the following factual history is necessary: In both January and July of 1994, unsubstantiated abuse referrals on K.P.'s family were conducted which revealed an atmosphere of domestic violence. On March 27, 1995, Jack and Jill were placed in the custody of the Hinds County DHS until such time as their mother could obtain adequate housing for the children and herself. On August 17, 1995, DHS proposed a case plan which the mother could complete to regain custody of her children. She refused to sign the case plan. DHS then offered her parenting classes which she also refused to attend. DHS also recommended that she obtain counseling. She attended one counseling session but never returned for any of the following appointments.
¶ 17. Additionally, the mother failed to secure housing for a period of at least 18 months. At trial, she described her living conditions as follows:
And after that I was just absolutely homeless. I lived in an abandoned apartment one time for about a year and a half with no electricity. I had no running water. The kids were not anywhere with me. They hadn't been with me since y'all (sic) took them in March.
She further explained that her reason for being homeless was because "God told me that he was going to use me in the ministry, and I became a street minister." On October 30, 1996, the children had been in foster care for 19 months and DHS filed a petition to terminate parental rights. During this litigation, DHS offered the mother another chance to regain custody of her children. She obtained the pro bono legal services of a Jackson attorney. On May 29, 1997, she signed a case plan which required her to complete psychological evaluations, attend individual and family counseling, complete parenting classes, secure and maintain housing and employment, and visit with DHS and her children twice a month. With the exception of counseling, she complied with the agreement, and Jack was returned to her physical custody on a trial basis by an Agreed Order entered on December 16, 1997. The Agreed Order reiterated her need to complete the counseling. She returned twice to the counseling sessions, but then failed to return for any other appointments. At trial, the mother explained that counseling "was a big, big, big waste of her time, a big, big, big waste of my time, my gas, my energy and my efforts...."
¶ 18. In In re T.A.P., 742 So.2d 1095, 1098 (Miss.1999), this Court expressed concern about DHS's failure to effectively implement a plan before it initiated termination proceedings. In the present case, however, DHS made diligent efforts to assist the mother in the return of her children. Perhaps it may best be described by Paul Davey, the expert psychotherapist, who testified, "I've been extremely impressed by Ms. Roark and her efforts that are wayin my opinion, way above and beyond the call of duty. I've just been very impressed by what I've seen documented, what she's tried to do and by my phone contacts with her, too, just in terms of the effort, the sheer lengths that she's gone to to try and give the mother the opportunity to regain custody of these children if she could." The mother's social worker, Elsie Roark, provided constant supervision and even went so far as to transport Jack back and forth from school when the mother did not have working transportation. Roark also provided the mother with her home phone number. When the family was later evicted from their home because the mother had not paid the rent, Roark made arrangements for the family to stay at a local motel until other housing arrangements could be made. She also assisted the mother in obtaining HUD housing. Moreover, the mother entered into her fourth marriage with an immigrant from Russia *913 after the termination action was filed by DHS. The new husband could not secure employment because of immigration problems, and DHS offered money towards resolving the citizenship conflict. However, the mother refused to accept the money.
¶ 19. In May of 1998, Jill was also returned to the mother on a trial basis. At this point, the mother decided to go on a "vacation trip" to Florida. She failed to inform her social worker or seek permission from the court to leave the state, all in direct violation of the Agreed Order. She then contacted Roark and asked if she could remain in Florida permanently. Although Roark informed her that she should not have left the state without court permission, she agreed to see if it was possible for the mother and her children to remain in the government housing that they had secured there. Accordingly, Roark requested the Florida Department of Children and Family Services to do a home study. Before this home study was completed, however, the mother was arrested for stabbing her husband with a paring knife. The Florida authorities removed the children from the home and sent them back to the Hinds County Department of Human Services. The Florida authorities found the living conditions to be adequate, but were concerned about the mother's mental condition and the violent atmosphere in the home. At trial, the mother testified that "America is full of domestic men that are pushing around women" and described the stabbing incident between her and her husband as follows:
[My husband] come (sic) in there ... and was angry, and started attacking me, and I just could not take it any more ... I don't know how it happened but he wrapped his legs around me, and he squeezed his legs as tight as he could, and I thought I was going to absolutely die. And I couldn't breathe ... And I said, I cannot take this anymore, and I went and picked up a paring knife, a blade about this big....And I was angry and upset, and so I pricked him, and that's all that happened. Nothing happened.
The mother still lives in Florida with her husband. Pursuant to the Interstate Compact on the Placement of Children, Miss. Code Ann. §§ 43-18-1 et seq. (1993), the Department of Human Services is prohibited from placing the children back in the mother's home without the approval of the state. Florida has denied placement of the children back in the home.
¶ 20. In the Order and Opinion, dated February 5, 1999, the chancellor determined that the mother had not terminated the "ongoing behavior" which needed to be eliminated before her children could be returned to her. The chancellor noted the "ongoing" behavior, which included:
Continued homelessness, not putting her children first such as housing at Mississippi College which did not include her children, refusing to give an address to the Department, refusing to sign the initial service agreement, refusing parenting classes, erratic job history with no actual proof of employment, demanding disposition especially as to visitation times, complaining about her two older children who were with a maternal aunt. Further Ms. Leggett testified that the mother's behavior also included: displaying inappropriate behavior such as giving most of the attention to [Jill] at the visits, telling [Jack] God would send them a house, visiting in an evening gown on her way to church, examining [Jill's] vagina for sexual abuse after a prophecy from God that a family member was being abused, disrupting placement of the children, taking different men to Sunnybrook to see [Jack] and telling him that they were his father.
(emphasis added).
¶ 21. "Our decisions have always stated the cardinal principle to be applied to custody decisions is that which is in the best interests and welfare of the minor *914 child." In re R.D., 658 So.2d 1378, 1386 (Miss.1995)(citing Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983)). "Therefore, the focus does not change in custody matters where it is not one parent vying against the other for custody of their child, but rather, DHS seeking to retain custody of a neglected or abused child rather than have him returned to a parent." Id. In the present case, the children have been in foster care for over five years. "The chancellor was correct to be concerned about the length of time the children had been in foster care. All too often children seem to remain forgotten and permanently implanted into the foster care system." Id. at 1389. Although the mother partially complied with the case plan once and regained a second chance at rearing her children, she ultimately chose to place the children in a violent domestic situation. When asked if he wanted to return to Florida or remain in foster care, Jack answered "foster care." Jill, now six years old, for all practical purposes has never had a mother and has never really "bonded" with anyone. At the end of Jill's one-hour session with Paul Davey, she was calling him "daddy."
¶ 22. "Although aware of the great responsibility placed upon any court when determining whether a parent's fundamental right to rear their offspring should be terminated, we think we would be remiss in our duties if we did not terminate the parental rights to safeguard the childrens' greater right to food, shelter, and opportunity to become useful citizens." Adams v. Powe, 469 So.2d 76, 78-79 (Miss.1985). As in Adams, the record is replete with evidence that the mother was given considerable opportunity and warning that she must change her lifestyle. Id. DHS required nothing more of the mother than asking that she provide her two minor children with the most basic necessities for a healthy life. In the present case, the best interest of the children would best be served by the termination of the mother's parental rights. For the foregoing reasons, we find that clear and convincing evidence was presented and that the chancellor was correct in terminating the mother's parental rights.

CONCLUSION
¶ 23. The mother's due process rights under the Fourteenth Amendment were not violated by the chancery court when it did not appoint her counsel in a parental rights termination trial, and the chancery court did not err in terminating her parental rights. Therefore, the judgment of the Hinds County Chancery Court is affirmed.
¶ 24. AFFIRMED.
PRATHER, C.J., PITTMAN AND BANKS, P.JJ., McRAE, SMITH, WALLER, COBB AND DIAZ, JJ., CONCUR.