# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-CT-01472-SCT

*JIMMY RAY CHISM, JR.*

*v.*

*ABBY GALE MORRIS CHISM BRIGHT*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/08/2011 |
| TRIAL JUDGE: | HON. C. MICHAEL MALSKI |
| TRIAL COURT ATTORNEYS: | J. MARK SHELDON |
| | JAK M. SMITH |
| COURT FROM WHICH APPEALED: | UNION COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | GREGORY M. HUNSUCKER |
| | JAK M. SMITH |
| ATTORNEYS FOR APPELLEE: | J. MARK SHELDON |
| | JANA L. DAWSON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 12/11/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT**

¶1.     Jimmy Ray Chism Jr. challenges the termination of his parental rights to his son,

Johnny.[1]  Because we find that Jim's parental rights were wrongfully terminated, we reverse

the judgments of Court of Appeals and the chancery court and remand this case to the Union

County Chancery Court.

---

[1]We use a fictitious name for the minor child to protect his identity.

## FACTS AND PROCEDURAL HISTORY

¶2.     Jimmy Ray Chism Jr. and Abby Gale Morris Chism Bright married on October 17, 2003.[2]  They had one child, Johnny, on March 17, 2004, and they divorced on March 10, 2008.  Under the divorce decree, the parties had joint legal custody of Johnny; Abby had primary physical custody, and Jim had regular, unrestricted visitation.  From March 2008 to July 4, 2008, Jim executed his visitation rights without incident.

¶3.     On July 4, 2008, Jim and Abby separately attended a party at Darden Lake.  Johnny stayed with Jim's parents, Dr. Jimmy Ray Chism Sr. and Terri Chism, at their cabin near Darden Lake.  On the morning of July 5, Jim picked Johnny up from his parents' cabin and drove him to a nearby McDonald's.  While in the drive-through line, Jim fell asleep with the car in park.  The police were called, and Jim was arrested for public intoxication.  Johnny was not injured during the incident, and Terri picked him up from the scene.

¶4.     On July 25, 2008, Abby filed an emergency petition for modification of Jim's visitation rights, based on the July 5 incident.  On August 18, 2008, the chancellor entered an order for modification of visitation which: (1) required that all Jim's visitation periods be supervised by Terri; (2) prohibited alcohol or drugs from being in Johnny's presence during his visitation periods with Jim; and (3) prohibited Jim from operating any motor vehicle with Johnny as a passenger.  The order also stated that:

> If Jimmy Ray Chism, Jr. fails to report to United States Army training facilities in Fort Benning, Georgia on September 3, 2008, all visitation will cease[,] and as a condition for reinstatement Jimmy Ray Chism, Jr. shall comply with all of the Union County Department of Human Services recommendations,

---

[2]We refer to the parties and to some of the other members of the Chism family by first name to avoid confusion.

including supplying a hair sample for DNA drug testing at a DHS approved medical facility, and he shall be committed to an in-patient treatment facility for a period of not less [than] thirty (30) days.

Jim did not report to the United States Army, and he did not begin satisfying the court's requirements to reinstate his visitation until July 15, 2009, when he admitted himself into Haven House for alcohol treatment. He spent fifty-one days at Haven House and, upon his discharge in September 2009, he attempted to resume his visitation with Johnny. When Abby did not respond to his requests, Jim filed a complaint for citation of contempt. In response, Abby filed a countercomplaint for termination of Jim's parental rights.

¶5. Jonathan Martin was appointed as Johnny's guardian ad litem on November 20, 2009. In accordance with Martin's recommendation, the chancellor awarded Jim and his family one hour of visitation on December 25, 2009; Jim and his family exercised their visitation rights without incident. On January 21, 2010, Jim again moved for additional visitation with Johnny, representing to the court that he had complied with the requirements of the August 18, 2008, modification order, and that the Christmas Day visitation had been a success.

¶6. Ultimately, the chancellor allowed Jim to have supervised visitation with Johnny on two occasions at his parents' home in early 2010, and both visits went well. After Jim failed two drug tests in the spring of 2010, Martin encouraged him to go to the National Counsel on Drugs and Alcohol Dependancy (NCADD) in Tupelo, Mississippi. Jim presented himself to NCADD in May 2010, and the director recommended him for inhouse treatment. Shortly thereafter, Jim burglarized one of his neighbor's homes while intoxicated. On June 27, 2010, Jim admitted himself into the Fairland treatment facility in Dublin, Mississippi, where he stayed for ninety-five days until he was discharged on October 1, 2010.

¶7.    Trial on Jim's complaint for citation of contempt and Abby's countercomplaint for termination of Jim's parental rights began on October 18, 2010. Jim testified that he believed he was on the road to recovery because of the care he received at Fairland, his new anti-depressant prescription, a renewed spiritual commitment, and his support system, consisting of his family, girlfriend, and sponsor. Trial adjourned,[3] and on November 19, 2010, Jim consumed large amounts of alcohol and Xanax and broke into a neighbor's house, where he passed out. A neighbor found him unresponsive and called 911. Medical personnel resuscitated Jim, and he was later arrested.

¶8.    Trial recommenced on July 11, 2011, and concluded on July 14.[4] When trial resumed, Jim admitted to committing the criminal acts for which he was arrested on November 19, 2010, and he also admitted to adulterating drug-test samples he had provided back in May of 2010. Jim testified that being incarcerated had caused him to hit rock bottom and had truly changed his life for the better. He also stated that, despite his absence, his relationship with Johnny had not deteriorated and that he and Johnny still loved each other very much. He admitted that, before his incarceration, he thought he was doing everything he needed to do to stay sober, but that he still relapsed. He admitted that he was an alcoholic and said he believed he had been an addict his whole life. He also admitted that Johnny needed stability in his life and that C.J. Bright, Abby's husband, was a good man who provided Johnny with that stability. But Jim also emphasized that, besides the July 5 incident, he had never

---

[3]The chancellor's order does not indicate why the trial was continued.

[4]Dr. Chism's and Terri's separate complaint for grandparents' visitation was consolidated with Abby's countercomplaint to terminate Jim's parental rights while the trial was recessed from October 18, 2010, to July 11, 2011.

committed a crime or been intoxicated around Johnny, and he agreed to abide by any visitation restrictions the court deemed necessary.

¶9.    In addition to his own testimony, Jim provided testimony from his parents, his sister, and his girlfriend. All four acknowledged that Jim had a substance-abuse problem, but all four also believed he was on the road to recovery and that terminating his parental rights was not in Johnny's best interest.  Jim also called Dr. Sam Fleming, who was tendered and accepted as an expert in neuropsychology.  Dr. Fleming diagnosed Jim with substance-induced bipolar disorder and testified that, with the proper treatment regimen, Jim could overcome his disorder and become a successful member of society.  Notably, Dr. Fleming did not believe Jim had an alcohol addiction.  But he did acknowledge that, based on Jim's history, he "ha[d] a very poor prognosis for not using alcohol or drugs again."

¶10.    Abby, Bright, and Martin testified in favor of terminating Jim's parental rights.  Abby testified that Johnny needed a "steady father" in his life, not a father who reemerged every six months between bouts of drunkenness, rehabilitation, and incarceration.  Bright testified that he wanted to adopt Johnny and would be able to care for him financially without the benefit of child support.  Finally, Martin testified that he believed the grounds for termination were shown by clear and convincing evidence and that termination was appropriate because:

> The minor child would clearly suffer emotional distress for the coming years if his father, [Jim], continued to travel in and out of his life at the convenience and scheduling of his limited periods of sobriety.  The minor child would suffer emotional distress as the subject of continued . . . litigation related to his father's visitation . . . I believe it's in the best interest of the minor child to have a father who is stable, has sound moral judgment, who can contribute to his upbringing, to his well being; for example, the simple ability to be at liberty to talk to his teachers or take him to extracurricular activities and to impart sound wisdom.  The last reason I would cite at this time that it would

5

be in his best interest for a termination of parental rights and adoption is that in the event that the minor child's mother should meet an untimely passing, a termination at this time of [Jim]'s parental rights and allowed adoption by Mr. Bright would provide the minor child stability, as his father would be present.

¶11. On September 8, 2011, the chancellor entered an order that: (1) terminated Jim's parental rights; [5] (2) awarded Dr. Chism and Terri grandparent visitation; and (3) provided that Jim could have contact with Johnny after Jim had been sober for a six-month period following his release from jail. Jim appealed, and the Court of Appeals affirmed the termination. *See Chism v. Bright*, 2013 WL 2166104 (Miss. Ct. App. May 21, 2013). This Court then granted Jim's petition for certiorari.

## STANDARD OF REVIEW

¶12. A chancellor's findings of fact in a termination-of-parental-rights case are reviewed under the "manifest error/substantial credible evidence" test and will not be reversed so long as "credible proof exists to support the chancellor's finding of fact by clear and convincing evidence." *W.A.S. v. A.L.G.*, 949 So. 2d 31, 34 (Miss. 2007). But questions of law such as statutory construction are subject to *de novo* review, and if a chancellor misapprehends the controlling rules of law or acts pursuant to a substantially erroneous view of the law, reversal is proper. *Ethredge v. Yawn*, 605 So. 2d 761, 764 (Miss. 1992).

## LAW AND ANALYSIS

_____

[5]The chancellor found that Jim's parental rights should be terminated under Mississippi Code Section 93-15-103(3)(e)(i), which states: "(3) Grounds for termination of parental rights shall be based on one or more of the following factors: (e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent's care and custody: . . . (i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child[.]" Miss. Code Ann. § 93-15-103(3)(e)(i) (Rev. 2013).

6

¶13.   Parents have a "fundamental liberty interest . . . in the care, custody, and management of their child" that cannot be taken away without clear and convincing evidence of the required statutory grounds for termination of parental rights. *Santosky v. Kramer*, 455 U.S. 745, 754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see also* J. Jackson and M. Miller, *Encyclopedia of Mississippi Law* § 78:39 (2002) (citing Miss. Code Ann. § 93-15-103(3)). State statutes providing for the termination of parental rights are subject to strict scrutiny and "[c]ourts may not add to the enumerated grounds." Deborah H. Bell, *Bell on Mississippi Family Law* 409 (2005) (citing *Gunter v. Gray*, 876 So. 2d 315 (Miss. 2004)); *see also Rias v. Henderson*, 342 So. 2d 737, 739 (Miss. 1977) (holding that statutes affecting fundamental constitutional rights are subject to strict scrutiny).

¶14.   This Court has stated that "[b]ecause parental rights are so important," the "circumstances under which [those rights] can be terminated by the government" are "sharply limit[ed.]" *Gunter v. Gray*, 876 So. 2d at 317. Title 93, Chapter 15 of the Mississippi Code sets out the requirements and procedure for the termination of parental rights. *See* Miss. Code Ann. §§ 93-15-101 through 93-15-111 (Rev. 2013).

¶15.   As mentioned above, the chancellor found that Jim's parental rights should be terminated because he exhibited "ongoing behavior which would make it impossible to return the minor child to his care and custody because he has a diagnosable condition, specifically alcohol and drug addiction, unlikely to change within a reasonable time which makes him unable to assume minimally, acceptable care of the child . . . ." But neither the chancellor nor the Court of Appeals addressed subsection (1) of Section 93-15-103, which sets out three

7

prerequisites that must be met *before* the court may invoke any specific ground for termination. Section 93-15-103(1) states:

> (1) *When* a child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, relatives are not appropriate or are unavailable, and when adoption is in the best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child's bonds to his natural parents and the effect of future contacts between them, *the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights.* The grounds may apply singly or in combination in any given case.

Miss. Code Ann. § 93-15-103(1) (Rev. 2013) (emphasis added). *See also **In Re Dissolution of Marriage of Leverock and Hamby***, 23 So. 3d 424, 428 (Miss. 2009). This Court previously has categorized the three prerequisites in subsection (1) as follows:

> (1) the child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time *or* the parent is unable or unwilling to care for the child; (2) relatives are not appropriate or are unavailable; and (3) adoption is in the best interest of the child.

*Leverock*, 23 So. 3d at 428 (emphasis added).

¶16. Here, it is undisputed that Johnny was not "removed from the home of his natural parents." And we also do not find from this record that Jim is "unable or unwilling" to care for Johnny. First, the chancellor's finding that Jim was "unable to assume minimally acceptable care"[6] of Johnny is belied by the fact that he also allowed Jim to have contact with Johnny after he is sober for six months. Neither Abby nor anyone else objects to this.

---

[6]To be clear, the chancellor was analyzing this under Section 93-15-103(3), instead of Section 93-15-103(1).

Simply because Jim might not be the best choice to be Johnny's full-time *custodial* parent certainly does not mean that he is "unable to care" for Johnny. This Court "has never allowed termination of parental rights only because others may be better parents." ***W.A.S.***, 949 So. 2d at 35. Second, it is undisputed that Jim wants to be a part of Johnny's life and that they have a very loving relationship, which evidences that Jim is not unwilling to care for him.

¶17. Moreover, we affirm the overarching premise that termination of parental rights is a last resort. This intent is evidenced by the Legislature in Section 93-15-103(4), which states:

> Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services *should be considered as alternatives to the termination of parental rights*, and *these alternatives should be selected when*, in the best interest of the child, parental contacts are desirable and *it is possible to secure such placement without termination of parental rights.*

Miss. Code Ann. § 93-15-103(4) (Rev. 2013) (emphasis added). In short, Abby has not proven the statutory prerequisites found in Section 93-15-103(1) that must be met. As such, we decline to address the specific ground for termination analyzed by the chancellor, or whether termination is in Johnny's best interest. For these reasons, we reverse the termination order and remand this case to the Union County Chancery Court for further proceedings consistent with this opinion.

¶18. **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**

9