ROBERTS, J.,
for the Court:
¶ 1. Following their divorce in 2011, Amanda Pritchett (Amanda) filed for a termination of her ex-husband James Pritchett’s (James) parental rights to their two children.[1] The DeSoto County Chancery Court granted Amanda’s motion and terminated James’s parental rights. James argues on appeal that, due to his indigency, the chancery court should have appointed an attorney to represent him due to his incarceration and arranged for his transportation from his prison facility to the hearing. He also argues that the chancery court misapplied Mississippi Code Annotated section 93-15-103 (Rev. 2013). Finding error, we reverse and remand for the chancery court to conduct further proceedings consistent with this opinion.
*1108 FACTS AND PROCEDURAL HISTORY
¶ 2. In the DeSoto County Circuit Court, on November 2, 2010, James pled guilty to one count of fondling his niece and was sentenced to serve five years in the custody of the Mississippi Department of Corrections (MDOC), with ten years of post-release supervision to follow.[2] At the time of the incident, James was married to Amanda; however, after James’s incarceration, they divorced in 2011, with Amanda receiving primary custody of their two children, and James receiving supervised visitation. James is presently incarcerated; the MDOC web site lists his expected release date to be December 2015.[3]
¶ 3. On April 5, 2013, Amanda filed a petition in the chancery court in the divorce action to terminate James’s parental rights pursuant to Mississippi Code Annotated section 93 — 15—103(3)(e)—(f). She additionally requested that she and their two children be permitted to change their surnames to her maiden name. Lastly, Amanda asked that the chancery court find James in contempt for violating a provision of their divorce decree when he allegedly removed her name from a Franklin Templeton investment account. At the time, James was being held by the MDOC in the Carroll/Montgomery County Correctional Facility in Vaiden, Mississippi.
¶ 4. The chancery court appointed a guardian ad litem (GAL) on April 22, 2013, and the GAL report submitted to the chancery court noted that James had not seen the children since April 2010 and that he had provided no financial support to them since then. The report also noted that their seven-year-old daughter, who was three years old when James was initially incarcerated, does not know where James is and has no specific memories of him. Their ten-year-old son, who was about six years old when the incident occurred, remembers James. He is not afraid of James, but does not want to see James and is embarrassed to talk about him because he remembers what happened related to the crime. The report also indicated that Amanda claimed she had found child pornography on James’s computer, but that James was never accused or prosecuted for that; James denied that accusation. The GAL’s report also stated that James submitted a letter to her expressing that he did not wish to have his rights terminated, and he loved his children with all his heart. Finally, the GAL concluded:
[CJlearly there is deep seated empathy [sic] based on the prolonged incarceration of the Father. The incarceration is based on his plea to fondling a minor. Both these factors are sfatutory reasons for termination and based on same, it is the recommendation of this GAL that the paternal rights of [James Pritchett] be terminated. The mother has the financial ability to support these children^] and they are so young that there is no real relationship with the father.
¶ 5. James sent three letters to the chancery court. His first letter, on May 13, 2013, requested that the chancery court appoint him an attorney because he was destitute and could not afford an attorney. He also requested help in coordinating transportation from where he was incarcerated to the hearing in DeSoto County. His letter refuted that section 93-15-103 was applicable, and he denied that he made any changes to the Franklin Temple-ton account. He further objected to Amanda’s request to have the children *1109 change their surnames. James’s second letter was sent May 20, 2013, and again requested that the chancery court notify him of the status of his request for an appointed attorney, and that if one was not appointed, the chancery court obtain transportation for him so he could be present for the hearing. Following his second letter, the chancery court issued an order stating that James was properly served with process pursuant to Mississippi Rules of Civil Procedure 4 and 81, and that it considered James’s letters to be an answer to Amanda’s complaint. The chancery court continued “this matter for [ (James) ] to arrange transportation.” On August 22, 2013, James sent a third letter, again claiming indigency and seeking an appointed attorney and transportation to the hearing. Based on this record, his requests were never specifically addressed by the chancery court, and he was not present or represented by counsel at the September 18, 2013 hearing.
¶ 6. Following the hearing, the chancery court entered an order on September 18, 2013, that, pursuant to section 93-15-103, it was in the children’s best interest to terminate James’s parental rights; Amanda and the children are permitted to change their surnames from “Pritchett” to Amanda’s maiden name; and that James was in contempt for “liquidating one of the [retirement] aecounts[,]” and he must transfer the Franklin Templeton account to Amanda, as well as pay for Amanda’s attorney’s fee and court costs. James timely appealed pro se. Regrettably, the appellate record does not contain a transcription of the hearing.
¶ 7. James raises nineteen issues on appeal, which we recite verbatim:
1.[James] is currently incarcerated and was incarcerated at the time of the hearing.
2. [James’s] right to due process was violated.
3. [The chancery] court ignored [James’s] three requests for appointment of counsel.
4. [The chancery] court ignored [James’s] three requests for transportation from incarceration to the hearing.
5. [The chancery] court ignored [James’s] application to appeal in forma pauperis.
6. [Section] 93-15-103 was misapplied by the [chancery] court.
7. [The chancery] court’s appointment of [a] guardian ad litem violated Mississippi Code Annotated section 93-15-107 [ (Rev.2013) ].
8. [The] guardian ad litem did not notify parties of the witness interview schedule.
9. [The] guardian ad litem did not supply a copy of her report to [James].
10. [James] ... was not allowed a trial by jury and did not sign a waiver.
11. The guardian ad litem and [Amanda’s] counsel are related, in violation of section 93-15-107.
12. [The] guardian ad litem[’s] report contained a myriad of false information[,] as well as a false accusation of criminal activity (child porn) by [Amanda].
13. No alternative to termination of parental rights was proposed or considered by the [chancery] court, guardian ad litem, or the Department of Health.
14. [James] was not allowed to examine witnesses in court.
15. No evidence of “changing account information” or “liquidating an account” was presented to the [chancery] court.
*1110 16. [The chancery] court ignored [the Mississippi] Supreme Court’s order to rule on [James’s] application to appeal in forma pauperis.
17. [The chancery court] illegally seized [James’s] [c]ollege [s]avings [a]ccount base[d] on [an] improper contempt[-]of[-]court ruling.
18. The Franklin Templeton [a]ccounts were not/are not retirement accounts, but [are][c]ollege [s]avings [a]ccounts[,] and therefore [are] not subject to the [d]ecree of [d]ivorce.
19. [James] was not allowed a trial by jury, nor did [he] waive that right.
For the purposes of this appeal, we combine several of James’s issues for the sake of clarity and efficiency. Other issues unlikely to occur on retrial, we defer.
STANDARD OF REVIEW
¶ 8. In Chism v. Bright, 152 So.3d 318, 322 (¶ 12) (Miss.2014) (internal citations and quotations omitted), the Mississippi Supreme Court outlined the appellate standard of review for cases involving the termination of parental rights:
A chancellor’s findings of fact in a termination-of-parental-rights case are reviewed under the manifest error/substantial credible evidence test and will not be reversed so long as credible proof exists to support the chancellor’s finding of fact by clear and convincing evidence .... But questions of law such as statutory construction are subject to de novo review, and if a chancellor misapprehends the controlling rules of law or acts pursuant to a substantially erroneous view of the law, reversal is proper.
ANALYSIS
I. Appointment of Counsel
¶ 9. As was outlined above, James claimed indigency and requested an attorney be appointed on three separate occasions, and the chancery court never addressed his requests, nor did it appoint an attorney to represent him. It is well established, through the Sixth Amendment to the United States Constitution, that an indigent defendant in a criminal case has a right to the assistance of counsel, specifically when a defendant’s loss of liberty may result; however, the case before us today is a civil case.
¶ 10. Nonetheless, it is also well established that “a parent’s desire for and right to ‘the companionship, care, custody!,] and management of his or her children’ is an important interest that ‘undeniably warrants deference and, absent a powerful countervailing interest, protection.’ ” Lassiter v. Dep’t of Soc. Servs. of Durham Cnty., N.C., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Further, “[a] parent’s interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore!,] a commanding one.” Id. In footnote three of Lassiter, the Supreme Court noted that “[s]ome parents will have an additional interest to protect. Petitions to terminate parental rights are not uncommonly based on alleged criminal activity. Parents so accused may need legal counsel to guide them in understanding the problems such petitions may create.” The Supreme Court held in Lassiter that it would not be “‘prudent to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is necessary ... since ‘the facts and circumstances.are susceptible of almost infinite variation.’ ” Id. at 32, 101 S.Ct. 2153 (quoting Gagnon v. Scarpelli, 411 U.S. 778, 790, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)). It also stated that “[i]nformed opinion has clearly come to *1111 hold that an indigent parent is entitled to the assistance of appointed counsel[,] not only in parental termination proceedings, but also in dependency and neglect proceedings!;.]” Id. at 33-34, 101 S.Ct. 2153. But the Supreme Court ultimately left the decision on whether to appoint counsel to be decided on a case-by-case basis by the state. At the time of Lassiter, statutes in thirty-three states and the District of Columbia provided for the appointment of counsel in termination cases. Id. at 34, 101 S.Ct. 2153.
¶ 11. The termination of parental rights is a serious and permanent proceeding, one which effectively ends any ties between a parent and a child. The Mississippi Legislature recognized the seriousness of such an event and recommended that alternatives to the termination of parental rights be pursued “when, in the best interest of the child, parental contacts are desirable[.]” Miss.Code Ann. § 93-15-103(4). The Mississippi Supreme Court case of K.D.G.L.B.P. v. Hinds County Department of Human Services, 771 So.2d 907, 909 (¶ 8) (Miss.2000), also involved the question of whether a natural parent should be appointed an attorney in a termination-of-parental-rights proceeding. In K.D.G.L.B.P., the chancery court thoroughly questioned the natural mother about the lack of an attorney and whether she would represent herself. Id. at (¶ 9). She indicated that she would represent herself, she never asked for a continuance, and she did not indicate that she was unable to afford an attorney. Id. at 909-10 (¶¶ 9-10). The supreme court, in analyzing Lassiter, stated:
One of the most important factors to be considered in applying the standards for court[-]appointed counsel is whether the presence of counsel would have made a determinative difference. The Lassiter decision thus states that appointment of counsel in termination proceedings, while wise, is not mandatory and therefore should be determined by state courts on a case-by-case basis.
Id. at 910 (¶ 12). The supreme court went on to find that “the mother was granted a fair and adequate hearing.” Id. at 911 (¶ 14). .
She was given ample notice of the proceeding in time for her to secure suitable counsel. At trial, she never asked for a continuance or for additional time to seek substitute counsel. Instead, she signified to the court that she intended to represent herself and that she was ready to proceed. Furthermore, on the day of trial, she did not even allude to the fact that her financial condition might have precluded her from being able to retain counsel. This argument was only raised in post-trial motions. Finally, the evidence supporting the chancellor’s decision to terminate the mother’s parental rights was so overwhelming that the presence of counsel would not have changed the outcome of the trial. Although the termination of parental rights is a serious judicial proceeding, a review of the record indicates that the chancellor’s actions ensured that the mother was provided a constitutionally adequate hearing as guaranteed by the Fourteenth Amendment.

Id.

¶ 12. The ease before us is distinguishable from K.D.G.L.B.P. in that serious due-process concerns exist in this case that were not present in K.D.G.L.B.P. James claimed' indigency in three letters filed with' the chancery court and requested appointment of counsel. The record does not contain a response from the chancery court. Furthermore, James requested the chancery court assist him with securing transportation to the hearing. The only action taken by the chancery court was to *1112 “continue [the] matter for [James] to arrange transportation.” Since James was an inmate in MDOC custody, it appears disingenuous to say that he could arrange his own transportation. The hearing proceeded in James’s absence.
¶ 13. We simply are unable to conclude, based on the scant record we have, that the presence of counsel would not have made an outcome-determinative difference. As an illustration, James’s request to be present for the hearing could have been secured by his attorney filing a writ of habeas corpus ad testificandum, which, would have required James’s presence at the hearing to testify. Such a common-law writ would command the custodian, MDOC, to bring James to the chancery court to testify. Mississippi Code Annotated section 9-1-19 (Rev.2014) and Mississippi Code Annotated section 11-43-7 (Rev.2012) provide chancery courts the authority to grant such writs as habeas corpus. Additionally, an attorney’s presence could have aided James with presenting the complex issue of the applicability of the section 93-15-103 to the present facts.
¶ 14. We reverse the chancery court’s decision and remand this case for the chancery court to determine the question of indigency and the necessity of appointment of counsel under Lassiter, and for the chancery court to make appropriate arrangements for James to be present and/or participate in the proceedings.
II. Applicability of Section 93-15-103
¶ 15. The chancery court’s decree cited section 93-15-103 as the authority to terminate James’s parental rights, specifically section 93 — 15—103(3) (f) — (g). Section 93-15-103 (emphasis added) provides, in pertinent part:
(1)When a child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, relatives are not appropriate or are unavailable, and when adoption is in the best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child’s bonds to his natural parents and the effect of future contacts between them, the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights. The grounds may apply singly or in combination in any given case.
[[Image here]]
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
(a) A parent has deserted without means of identification or abandoned a child as defined in Section 97-5-1, or
(b) A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
(c) A parent has been responsible for a series of abusive incidents concerning one or more children; or
(d) When the child has been in the care and custody of a licensed child caring agency or the Department of Human Services for at least one (1) year, that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:
(i) The parent has failed to exercise reasonable available visitation with the child; or
*1113 (ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent; or
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
(i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring "agency to assist the parent; or
(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment; or
(g) When a parent has been convicted of any of the following offenses against any child: (i) rape of a child under the provisions of Section 97-3-65, (ii) sexual battery of a child under the provisions of Section 97 — 3—95(c), (iii) touching a child for lustful purposes under the provisions of Section 97-5-23, (iv) exploitation of a child under the provisions of Section 97-5-31, (v) felonious abuse or battery of a child under the provisions of Section 97-5-39(2), (vi) carnal knowledge of a step or adopted child or a child of a cohabitating partner under the provisions of Section 97-5-41, or (vii) murder of another child of such parent, voluntary manslaughter of another child of such parent, aided or abetted, attempted, conspired or solicited to commit such murder or voluntary manslaughter, or a felony assault that results in the serious bodily injury to the surviving child or another child of such parent; or
(h)The child has been adjudicated to have been abused or neglected and custody has been transferred from thé child’s parent(s) for placement pursuant to Section 43-15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child’s best interest.
¶ 16. Recently, the supreme court addressed this statute in Chism, 152 So.3d at 322-24 (¶¶ 14-17).[4] It noted that “neither the chancellor nor the Court of Appeals addressed subsection (1) of Section 93-15-103, which sets out three prerequisites that must be met before the court may invoke any specific ground for termination.” Id. at 322-23 (¶ 15). The three prerequisites in subsection (1) are as follows:
(1) the child has been removed from the home of [his] natural parents and cannot be returned to the home of his natural parents within a reasonable length of time or the parent is unable or unwilling to care for the child; (2) relatives are *1114 not appropriate or are unavailable; and (3) adoption is in the best interest of the child.
Id. (quoting In re Dissolution of Marriage of Leverock & Hamby, 23 So.3d 424, 428 (¶ 15) (Miss.2009)). The supreme court found that the child never was removed from the home of his natural parents, and it had not been shown that the natural father was unable or unwilling to care for the child. Id. at 323 (¶ 16). Therefore, it found that the natural mother had not proven the statutory prerequisites. Id. at (¶ 17).
¶ 17. In the present case, the children, since birth, have remained in the custody of the natural mother, Amanda, who is seeking the termination of the natural father’s parental rights. Thus, the first prerequisite of section 93-15-103(1) clearly has not been satisfied. Further, there was no evidence that a relative was unavailable to care for the children as prerequisite two requires, since Amanda sought to retain custody. And lastly, there was no evidence that adoption was in the best interest of the children. The children have remained in Amanda’s custody, and there is no evidence that adoption by anyone else was ever contemplated, as the word “adoption” does not appear in the record.
¶ 18. Because Amanda did not satisfy the prerequisites outlined above, the enumerated grounds for the termination of parental rights found in section 93-15-103(3) were not applicable. Consequently, the chancery court erred in applying the statute as justification for terminating James’s parental rights.
¶ 19. Since we are reversing and remanding on these issues, we do not believe the remaining issues James raises are likely to occur on retrial. Therefore, we decline to address them. See Rucker v. Hopkins, 499 So.2d 766, 773 (Miss.1986).
¶ 20. THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. Based on the sensitive nature of these proceedings and in the interest of privacy, we have substituted fictitious names for the family. Additionally, our standard practice is to refer to parties by their last names; however, due to the confusion it would create in this case, we will refer to them by their first names.

. Neither the exact date of the fondling incident nor the age of his niece appears in the record.

. http://www.mdoc.state.ms.us/InmateDetails. asp?Passed!d= 163258

. We note that the supreme court's decision in Chism had not been released prior to the chancery court's termination of James’s parental rights on September 18, 2013.