FAIR, J.,
for the Court:
¶ 1. Christine Adams and Kevin O’Neil appeal the Lee County Chancery'Court’s judgment terminating their parental rights to two of Christine’s children.[1] They argue that the requirements for termination under Mississippi Code Annotated section 93-15-103 (Rev.2013) were not met. Finding no reversible error, we affirm.
FACTS
¶ 2. Christine and Kevin live in Fitzgerald, Georgia. They married in'2003 and *1071 have one child together, Melanie, born in 2001. Christine already had two daughters .with Joe Simpson — Tiffany Simpson, born in 1998, and Katherine Adams, born in 1997.[2] Around 2008, Christine and Kevin were struggling with their marriage, and Christine had a drug problem. So, at the recommendation of their pastor, Christine and Kevin placed Tiffany and Katherine in the physical custody of Tupelo Children’s Mansion (TCM), a Christian group home in Tupelo, Mississippi. Tiffany stayed at TCM until she turned eighteen in the summer of 2011. She went back to Georgia shortly after. That same summer, Katherine went back home to live with Christine and Kevin, but returned to TCM a few weeks later. Melanie joined Katherine at TCM in the summer of 2012.
¶ 3. On October 26, 2012, Christine and Kevin entered into two separate service agreements with TCM — one for Katherine and one for Melanie.[3] The service agreements outlined the responsibilities of Christine, Kevin, and TCM for both girls. Christine and Kevin[4] agreed to pay child support and participate in bimonthly visitation. ' They also agreed to be tested each month to show they were not using alcohol or other drugs. And in the event they wished to remove either child‘from TCM, Christine and Kevin agreed to obtain a home study to ensure their home was suitable for placement... TCM agreed to provide twenty-four-hour custodial care to both children, provide for their educational needs, and implement a “return plan” to a suitable home environment that was in the best interest of the children. The final clause of the agreement provided that, if the parents “have not made proper changes and plans to provide the adequate care necessary to--meet the needs of the children:... [,] procedures .will begin to terminate parental-rights so that a permanent plan may be carried out for the best interest of the child.”
¶ 4. Oh November 6, 2013, TCM petitioned for custody of Katherine and Melanie and termination of Christine; Kevin, and Joe’s parental rights. The chancery court appointed a guardian ad litem (GAL) under Mississippi Code Annotated section 93-15-107 (Rév.2013) and held a hearing in August 2014. Katherine and Melanie both testified that they did not want to go home with Christine and Kevin but instead wanted to be‘adopted by another family. Kathryn Slagle, an employee at TCM, testified to the parents’ poor living conditions that she saw when she picked up the girls for transfer to TCM. Christine, Kevin, their pastor)-and Christine’s mttther-all testified on behalf of Christine and Kevin. The chancellor also heard from the GAL, who recommended that the natural parents’ rights be terminated and that -the children be placed in TCM’s custody so they could be adopted.
¶ 5. The chancellor reviewed the GAL’s report, detailing his interviews with the girls, Christine, Kevin, their pastor, Christine’s mother, the c'ase manager at TCM, and the girls’ counselor, who, too, recommended that the girls not be returned to Christine and Kevin. Christine’s criminal record showed that she had been arrested for possession of methamphetamine and dfug paraphernalia while driving with her daughter Tiffany, who was also arrested for drug possession. Throughout 2013, *1072 Christine repeatedly tested positive for opiates or methamphetaraine.
¶ 6. The chancellor terminated the 'parental rights of (1) Christine and Joe Simpson as related to Katherine, and (2) Christine and Kevin as related to Melanie. The girls were placed in TCM’s physical and legal custody and adopted, together, six weeks later, Christine and Kevin appeal.
STANDARD OF REVIEW
¶ 7. A chancellor’s findings of fact in a termination-of-parental-rights case are reviewed under the manifest error/substantial credible evidence test and will not be reversed so long as credible proof exists to support the chancellor’s finding of fact by clear and convincing evidence. But questions of law such as statutory construction are subject, to de novo review, and if a chancellor misapprehends the controlling rules- of law or. acts pursuant to a substantially erroneous view of the law, reversal is proper.
Pritchett v. Pritchett, 161 So.3d 1106, 1110 (¶ 8) (Miss.Ct.App.2015) (quoting Chism v. Bright, 152 So.3d 318, 322 (¶ 12) (Miss.2014)).
ANALYSIS
¶ 8. Section 93-15-103 provides, in pertinent part:
(1) When a child fias been removed from the home of its natural parents and cannot be returned to the home of his natural parents: within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, relatives are not appropriate or are unavailable, and when adoption is in the best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child’s bonds to his natural parents and the effect of future contacts between them, the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights. The grounds may apply singly or in combination in any given case.
[[Image here]]
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
(a) A parent has deserted without means of identification or abandoned a child as defined in Section 97-5-1, or
(b) A parent has made ho contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
(c) A parent has been responsible for a series of abusive incidents concerning one or more children; or
(d) When the child has been in the care and custody of a licensed child caring agency or the Department of Human Services for at least one (1) year, that agency or the department has made diligent efforts to develop and implement á plan for return of the child to its parents, and:
(i) The parent has failed to exercise reasonable available visitation with the child; or
(ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan' so that the child caring agency is unable to return the child to said parent; or
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
*1073 (i) Because the parent has a diagnosable condition unlikely ,to change within a reasonable time such as alcohol or drug addiction, severe mental, deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent; or
(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment; or
(g) "When a parent has been convicted of any of the following offenses against any child: (i) rape of a child under the provisions of Section 97-3-65, (ii) sexual battery of a child under the provisions of Section 97-3-95(c), (iii)touching a child for lustful purposes under the provisions of Section 97-5-23, (iv) exploitation of a child under the provisions of Section 97-5-31, (v) felonious abuse or battery of a child under the provisions of Section 97-5-39(2),' (vi) carnal knowledge of a step or adopted child or a child of a cohabitating partner under the provisions of Section 97-5-41, or (vii) murder of another child of such parent, voluntary manslaughter of another child of such parent, aided or abetted, attempted, conspired or solicited to commit such murder or voluntary manslaughter, or a. felony assault that results in the . serious bodily injury to the surviving'child or another child of such parent;. or
(h)The child has been adjudicated' to have been abused or neglected and custody has been transferred' from the child’s parent(s) for placement pursuant to Section'43-15-13, and a court of competent jurisdiction has-determined that reunification shall not be in the child’s best interest.
¶ 9. In Chism, the supreme court held that the following three prerequisites in subsection (1) must be met before addressing any specific grounds for termination:
(1) the child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time or the parent is unable or unwilling to care, for the child; (2) relatives are not appropriate or are unavailable; and (3) adoption is in the best interest of the child.
Chism, 152 So.3d at 322-23 (¶ 15); see also In re Dissolution of Marriage of Leverock & Hamby, 23 So.3d 424, 428 (¶ 15) (Miss.2009).
¶ 10. Here, the chancellor did not specifically address these three prerequisites before considering grounds for termination. We find, however, that the ‘record shows by clear and convincing evidence that the prerequisites have been met. Christine and Kevin removed Katherine and Melanie from their home by placing them in the physical custody of TCM. Christine and Kevin argue on appeal that, because the children were “voluntarily, removed” from the home, they were - not “removed” in accordance with the statute. We disagree. Our precedent on this issue does not distinguish between voluntary *1074 and involuntary removal. -Therefore, we find that Katherine and Melanie were in fact “removed” when the^ were placed in the physical custody of TCM. Further, the record shows that Katherine and Melanie could not be returned home for a reasonable length of time. In the summer of 2011, Katherine left TCM to go home, for a few weeks.. She testified that she asked her mother if she could return to TCM soon, after she got home. She also said the home was unclean, she was worried that she would not be taken care of, and she did not feel safe there. Kathryn Slagle from TCM testified that, when she went to pick up Katherine to return her to TCM, the house was in disrepair and there was dog feces throughout the house. Thé GAL also gave a similar description of the home after his impromptu visit, stating that the house was in “decrepit condition” and would likely be unapproved for placement of children by any licensed agency. He further stated that the family was living in “abject- poverty,” without finances to provide for the children.
¶ 11. As for prerequisite two, Christine’s mother testified that she would never “take away” or adopt the girls as long as their parents were alive. The GAL report stated otherwise — that Christine’s mother was willing to adopt the girls, but she was nearly seventy years old and in poor health. There was no evidence presented indicating other relatives were appropriate or available to care for the girls.
¶ 12. Regarding the final prerequisite, there was ample evidence presented to show adoption would be in the best interest of the girls. First, both girls testified that they did not-want to go home with Christine and Kevin and that they wanted to be adopted. Second, the GAL stated in his report that there was a married couple that was financially stable and ready to adopt Katherine and Melanie (and did so after these proceedings). The couple had already developed a- relationship with the girls and had a daughter the same age as Melanie. And third, the girls’ counselor also stated that adoption would be in their best interest. Because the prerequisites listed in section 93-15-103(1) have been met; we now address the chancellor’s analysis on the grounds for termination.
¶ 13. The chancellor held that Christine and Kevin’s parental rights were terminated based on sections 93-15-103(3)(c), 93-15 — 103(3)(d), 93 — 15—103(3)(e)(ii), and 93-15-103(3)(f)., Only one ground for termination needs , to be satisfied to terminate parental rights. See Miss.Code Ann. § 93-15-103(3). But, in an abundance of caution, we will examine each ground addressed by the chancellor.
1. Section 93-15-103(3) (c)
¶ 14. The chancellor found that Christine had been responsible for a series of abusive incidents concerning both Katherine and Melanie. Specifically, she had repeatedly exposed the girls to her drug lifestyle and neglected- them as a result. The chancellor’s finding is supported by the testimony of Christine, Kevin, their pastor, both children, and her-mother, who all testified to Christine’s drug use. Christine’s criminal record and positive drug-test results further corroborate the chancellor’s ruling.
2. Section 93-15-103(3)(d)
¶ 15. It is. undisputed, that both girls have been with TCM.for at.least one year. The chancellor found that: TCM made diligent efforts to implement a plan for the children to return to Christine and Kevin, but both parents failed to carry out that plan. The chancellor also found that they had failed to exercise reasonable visitation with the children.-
*1075 ¶ 16. We find substantial evidence in the record to support the chancellor’s finding. As shown by the service agreements, TCM indeed made diligent efforts to implement a plan for return. The agreements also emphasized that procedures to terminate parental rights would begin if Christine and Kevin did not cooperate. Both Christine and Kevin signed the agreements.
¶ 17. The record shows that Christine and Kevin failed to comply with the agreements’ requirements. For example, the GAL noted that both parents failed to visit or call as often as agreed to and failed to provide any significant financial support. Nor did they obtain a home study to show their home was suitable for placement. Further, Christine tested positiye for drugs during the time the agreements were in effect.
3. Section 93-15-103(3) (e) (ii)
¶ 18. Based on the parents’ failure to comply with the service agreements (specifically their failure to obtain a home study), the chancellor concluded that they exhibited ongoing behavior that prevented placing the children back home. The chancellor gave more examples of the parents’ behavior, one being the attempt to put the children in a U-Haul trailer for a seven-hour drive. There were already two people riding in the back of the trailer without seats or seatbelts. In addition, Christine and Kevin wanted to homeschool the children but admittedly lacked the resources and education to do so.
4. Section 93-15~103(3)(f)
¶ 19. The chancellor found the “most telling basis for termination” to be the substantial erosion of the relationship between the parents and the children and the deep-seated antipathy of both children- towards their, parents, caused wholly by the parents’ “serious neglect, prolonged, and unreasonable absence' and unreasonable failüre to visit or communicate with- [the] children,' even through their [s]ervice Agreements.”
¶ 20. As previously discussed, Christine and Kevin failed to honor the service agreements. Slagle from TCM testified that both parents’ visits were few and far between. Christine visited Katherine once in 2011, and did not visit again until over one year later. Christine and Kevin visited TCM a total of five times from 2012 to 2013.
¶ 21. The girls’ testimony is even more compelling. 'At the hearing, Katherine stated:
I need to think about myself, not my [m]om. My [m]om is going to take care of herself, but I need someone to take care of me, to support me. I’m going to go to college. Who’s going to support me? Obviously, someone who is going to be my parent, and I haven’t seen her be my parent-for a very long time, and I don’t see it now.
Melanie said that she wanted to be adopted, even if that meant never seeing her parents again.
CONCLUSION
¶ 22. We find there was credible evidence to support the chancellor’s ruling that all requirements of Mississippi Code Annotated section 93-15-103 had been established by clear and convincing proof and that -termination of parental rights was in the best interests of the minor children. Therefore, we affirm.
¶ 23. THE JUDGMENT OF THE LEE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
*1076 ■ LEE, C.J., IRVING AND GRIFFIS; P.JJ., BARNES, ISHEE, CARLTON AND WILSON, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., NOT participating;

. The parents' and children’s names are changed for confidentiality. Kevin is the father of the younger child.

. Simpson was served with process by publication as an unknown putative father. He did not participate in any of the proceedings.

. Christine entered into a similar agreement for Katherine when she went to TCM in 2008.

. Kevin’s responsibilities only related to. his /daughter, Melanie.