# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00732-COA

E.H. AND J.H.          APPELLANTS

v.

LEE COUNTY DEPARTMENT OF CHILD          APPELLEES
PROTECTION SERVICES BY MARCUS D.
DAVENPORT, X.M.H., AND J.E.H., MINORS, BY
AND THROUGH THEIR NEXT FRIEND,
MARCUS D. DAVENPORT

| | |
|---|---|
| DATE OF JUDGMENT: | 05/24/2023 |
| TRIAL JUDGE: | HON. STACI SHUMPERT BEVILL |
| COURT FROM WHICH APPEALED: | LEE COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANTS: | BENNIE L. JONES JR. |
| ATTORNEY FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL BY: KRISTI DUNCAN KENNEDY |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 09/16/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1. Elizabeth and Jack Hanson (the Hansons) appeal the judgment of the Lee County Youth Court terminating their parental rights to their children, Xane and Jaden.[1] On appeal, the Hansons argue that the youth court's judgment terminating their parental rights was not supported by clear and convincing evidence of grounds for termination. The Hansons also argue that the court did not find that reunification between parents and children was not desirable toward a satisfactory permanency outcome, as required by statute. Because we find

---

[1] We use fictitious names for the parties to protect the identities of the minors.

that there was sufficient credible evidence to support the court's findings and that the youth court followed all necessary statutes, we affirm the judgment terminating parental rights.

## FACTS AND PROCEDURAL HISTORY

*CPS Involvement Begins*

¶2. Jaden was born in October 2019 and tested positive for cocaine shortly after his birth. Elizabeth was tested while still in the hospital following Jaden's birth, and she too tested positive for cocaine. At that time, Xane—who was not yet two—and Jack were living with Jack's family because of some mold issues at the Hansons' home. Jack was also trying to stay sober and keep away from Elizabeth. Mississippi Department of Child Protection Services (CPS) received a report about Jaden's positive drug test and began working on plans for the children's safety.

¶3. CPS developed an in-home service plan for Elizabeth and Xane to stay at Elizabeth's mother's home while Jaden remained in the hospital. However, at the end of October 2019, Elizabeth was removed from the home when she tested positive for cocaine, marijuana, MDMA, and opiates. Around this time, Jack's urine sample was clean, but a hair follicle test showed some cocaine usage. CPS also received reports that Elizabeth and Jack were not visiting or caring for Jaden while he remained hospitalized. Nevertheless, CPS created a "safety plan," with Jack's aunt supervising, to allow Jaden to be discharged to his parents' care in late November 2019; Xane remained with Elizabeth's mother. Shortly thereafter, the Hansons got into a disagreement with Jack's aunt, and they left her home. CPS and the Hansons worked to establish a safety plan with another family member, and Xane was

2

included in that placement as well.

¶4. In December 2019, Jack's urine test remained clean, but his hair follicle test indicated that there had been an increase in cocaine use since his last test. Elizabeth's hair test showed cocaine use, and her urine sample was positive for cocaine and marijuana. Elizabeth began inpatient drug treatment and stayed there until February 2020.

¶5. On January 28, 2020, CPS took custody of the children and placed them in a foster home after the safety plans failed. In March, the youth court adjudicated the children to be neglected under Mississippi Code Annotated section 93-15-115(a) (Supp. 2017). The youth court also signed off on a permanency plan with reunification as the primary goal. After this, CPS began creating service plans to work with the Hansons toward reunification with their children. The stated goal for the Hansons was to "provide a safe, drug free, and stable living environment for their children." They were tasked with not using illegal drugs when caring for the children and were required to submit to random drug screens. Both Elizabeth and Jack were told they needed to attend weekly Narcotics Anonymous meetings, receive inpatient rehabilitation services, and provide at least three consecutive negative drug screens.

¶6. In June 2021, the youth court entered a permanency order changing the permanency plan from reunification to adoption. The court found that CPS had made "reasonable efforts" to achieve the reunification plan, including family team meetings, contact with and reminders to the Hansons about their expectations, drug screens, and supervised visits. The court found that despite CPS's efforts, the Hansons have "failed to substantially comply" with the plan, and reunification was not in either child's best interest.

3

¶7.     Over the course of CPS's involvement, CPS arranged four home placements to give the Hansons the opportunity to keep their children: April 8 through May 6, 2020, ended because both parents tested positive for cocaine; August 25 through November 2, 2020, ended because the parents and children tested positive for cocaine; February 5 through March 2021 ended because the parents and children tested positive for cocaine; May 21 through August 18, 2022, ended because the parents tested positive for cocaine.

*Termination Proceedings*

¶8.     On January 6, 2022, CPS filed a petition to terminate Elizabeth and Jack's parental rights to Xane and Jaden. CPS's petition alleged that the Hansons had "engaged in conduct constituting abandonment or desertion" or were "mentally, morally, or otherwise unfit to raise" Xane and Jaden. CPS alleged that both Elizabeth and Jack were drug addicts and had "failed to successfully complete alcohol and/or drug treatment," which were grounds for termination under Mississippi Code Annotated section 93-15-121(c) (Supp. 2017). CPS further alleged that the Hansons' drug addictions made them unwilling to provide food, clothing, shelter, or medical care, which was ground for termination under section 93-15-121(d). CPS alleged that Elizabeth and Jack's behavior and conduct had caused Xane and Jaden to have "extreme and deep-seated antipathy" toward their biological parents, or there was "some other substantial erosion" of the parent-child relationship, which was grounds for termination under section 93-15-121(f).

¶9.     The youth court appointed a guardian ad litem (GAL) and set a trial on the petition to terminate for April 2022. At the April 2022 hearing, CPS moved for a continuance

4

because they had heard the Hansons were improving and because CPS was not ready. The GAL agreed, and the matter was continued and set for August. However, in August, the Hansons' attorney had to withdraw, and the youth court granted a continuance so they could find new counsel. At an October 2022 trial, the Hansons asked to be appointed counsel, but the youth court found that they were not indigent. The court advised them to find counsel and told them the court would have to take the matter forward if they failed to find counsel. After two additional continuances, the Hansons still did not have counsel by the time of the February 2023 hearing. The court explained their rights, the standard of clear and convincing evidence, and that the Hansons would be expected to follow the rules of trial like any attorney.

¶10.    Stephanie Walker, lead team member with CPS for the Hansons' case, testified about CPS's involvement with the Hansons. Walker testified that CPS became involved after receiving a report about Jaden's positive drug test at his birth. Elizabeth also tested positive and admitted using cocaine throughout her pregnancy with Jaden. Xane and Jack were not living with Elizabeth at the time of Jaden's birth due to Elizabeth's drug use.

¶11.    CPS created a safety plan at that time for Xane to remain with Jack at Jack's mother's house, but Jack later tested positive for cocaine. CPS continued to work to place the children with extended family members, but the plans continued to fail because of the parents' failed drug tests and arguments with placement homeowners. CPS finally took custody of the children in late January 2020, and the youth court adjudicated them as neglected children. CPS continued to work with the Hansons toward reunification, but the Hansons simply could

not quit using drugs. Walker testified that the Hansons never refused a drug test, that they maintained appropriate housing throughout, and that there were no issues with the Hansons' home. The Hansons were able to maintain a relationship with their children throughout the pendency of the case through trial home placements and supervised visitations.

¶12.    Walker testified that whenever both Elizabeth and Jack were clean, CPS would attempt a home placement. The placements always ended once the parents—or the children—tested positive for cocaine.[2] Walker testified that it was not CPS's usual policy to try four trial home placements before moving forward with termination. She said that CPS "went above and beyond" to try to keep the Hansons together.

¶13.    Walker testified that the Hansons' continued drug use and addiction made them unable to provide for their children's basic needs. She agreed that if the Hansons would stop using drugs, they would have been successfully reunited with their children. CPS eventually determined that the Hansons could not or would not stop using drugs, and it was not "fair" to the children to keep moving back and forth between their foster family and their parents due to their parents' inability to stay off drugs.

¶14.    Elizabeth testified and admitted to using drugs throughout the case. She testified that she had completed rehab twice since 2020 but relapsed each time and was not currently receiving drug treatment. Elizabeth also said that she was seeking counseling and had been working on her relationship with God.

¶15.    Elizabeth did not believe that she had failed her children physically, mentally,

---

[2] Walker explained that the children's positive test was from exposure to the drugs, not ingestion.

6

emotionally, or financially, though she admitted that it was upsetting to the children to have to explain to them why they could not "come home" with her or Jack. She testified that she did not feel "happy" about her children testing positive for cocaine, and she admitted that they tested positive because she had used it in front of or around them.

¶16. Jack testified that "drugs were a part of" their problems, but he mostly claimed that CPS had "failed [them] too" because they did not help Elizabeth get a Narcotics Anonymous sponsor. Jack denied that he had a drug problem or that he needed to go to rehab. He claimed that he had been clean for two years. When confronted with his positive tests, he claimed one was probably a cross-contamination and that another was likely because he had performed oral sex on Elizabeth when she was using drugs.

¶17. Jack was asked if he knew Elizabeth was using drugs, why did he not separate from her. Jack testified that he was a man of God and that his children did not come before his wife. He said his job was to protect the whole family, not just the children. He agreed that his children came second to his wife.

¶18. The GAL submitted her report as an exhibit. She told the judge that she had been the GAL since the beginning of the Hansons' case. She said she had "no doubt" that the Hansons had a connection with their children and that connection was one of the reasons CPS had been slow to terminate their parental rights. The GAL said that the Hansons could not stay off drugs. Though Jack claimed he did not have a drug problem, the GAL pointed out that his cocaine levels increased at various points during CPS's involvement with the Hansons.

¶19. The GAL said that the children's exposure to cocaine showed that there was a

7

"substantial risk of compromising or endangering [their] safety and welfare." She said that the Hansons asked for more time, but she did not "know how much more time that the [Hansons] could need." She believed that CPS made reasonable efforts to help the Hansons reunite with their children, but it was her belief that the children could not "be safely returned to their parents in a drug-free environment."

*Drug Tests*

¶20. Jack's and Elizabeth's drug tests were admitted as exhibits at the termination hearing. Sometimes both their urine and hair were tested for drugs, and other times only urine or hair were tested. Exhibits showed testing for Jack spanned eighteen months from February 2020 to January 2023. Of those eighteen months, Jack tested positive for cocaine eight times, and two of those positive tests also showed methamphetamine or marijuana use. Jack's tests were negative for all tested substances ten times.

¶21. Elizabeth was tested twenty-one times from October 2019 through January 2023. Her tests were positive for cocaine eleven times. Her tests in October and December 2019 also showed marijuana, MDMA, and opiate use. Her tests were also clean ten times.

¶22. The children also tested positive for cocaine. In October 2020, Jaden's and Xane's hair tests showed cocaine exposure. In March 2021, Jaden's hair was positive for amphetamine, cocaine, and marijuana exposure; Xane was positive for only cocaine. In June 2021, Jaden again tested positive for cocaine.

*Youth Court's Judgment Terminating Parental Rights*

¶23. On May 24, 2023, the youth court judge issued a memorandum and judgment

8

terminating the Hansons' parental rights. In the opinion, the youth court judge noted the GAL's opinion that it was in Xane and Jaden's best interest to terminate Elizabeth and Jack's parental rights because they were unfit due to their drug use, "several failed trial home placements," the children testing positive for cocaine on more than one occasion, and the fact that they were unable to provide the children a home free from drug exposure.

¶24. The youth court also found that Elizabeth and Jaden had tested positive for cocaine shortly after Jaden's birth and that Elizabeth admitted to cocaine use throughout her pregnancy. At that time, Xane and Jack were not living with Elizabeth because Jack was "trying to be sober." Elizabeth was discharged from the hospital, but she had nowhere to go at that time. Jaden stayed in the hospital.

¶25. The youth court further found that CPS developed an in-home service plan for Elizabeth and Xane to stay in Elizabeth's mother's home. However, Elizabeth was removed from the home at the end of October 2019 when her urine sample tested positive for cocaine, marijuana, MDMA, and opiates. Her hair screen also showed cocaine use. Jack's urine sample was clean, but his hair test showed some cocaine use.

¶26. The youth court noted that for the next few months, CPS tried to develop in-home service plans to keep the Hansons with their children, albeit with some supervision. But Jack and Elizabeth both tested positive for cocaine, with Jack's levels increasing, and CPS took custody of the children in January 2020. Elizabeth entered inpatient drug treatment after her December drug test and stayed until February 2020. The February 2020 drug tests indicated that Elizabeth was clean, as she had recently completed rehab, and Jack's showed decreased

9

cocaine levels. Jack also had been attending addiction-support meetings.

¶27. In April 2020, Jack's cocaine levels increased, though Elizabeth's urine test was still clean. Elizabeth's hair also showed some cocaine use. The youth court's order meticulously tracked Jack and Elizabeth's drug-screen results through January 2023. The youth court also found that despite their drug use, Jack and Elizabeth had completed all required parenting and conflict-resolution classes. Jack had been consistently employed, and Elizabeth had been employed for most of the time.

¶28. After making its factual findings, the youth court turned to CPS's burden of showing that termination of the Hansons' parental rights was appropriate. The youth court found that CPS met its showing, and the court concurred with the GAL's recommendation.

¶29. First, citing Mississippi Code Annotated section 93-15-115, the court found that the children had been in CPS custody for over three years and that the youth court had held a permanency hearing as required by statute. The court then evaluated whether CPS had shown through clear and convincing evidence that there were grounds for termination.

¶30. Looking to Mississippi Code Annotated section 93-15-119 (Supp. 2017), the court concluded that CPS had shown that the Hansons had effectively abandoned Jaden and Xane because they had been out of their parents' custody for over three years due to the parents' continued drug use. The court noted that Jaden had never lived with his parents and that Xane had been away from the family home for nearly forty months. The court also found that "the parents' drug use was conclusively shown to be the reason that reunification could not occur." Using this same logic, the court found that the Hansons had deserted Xane and

10

Jaden. The court found that Jack and Elizabeth's "last-ditch efforts of providing clean drug tests [were] simply not enough."

¶31.    Given this, the court held that reunification was "not desirable toward obtaining a satisfactory permanency outcome . . . based on the proof that the parents' conduct has been such that they have not nor do not have any intention of establishing a lasting[,] drug free home" for the children. The court found that this abandonment and desertion "demonstrate[d] a substantial risk of compromising or endangering the children's safety and welfare," and that termination was appropriate under section 93-15-119.

¶32.    The court also found that termination was appropriate under section 93-15-121 because the Hansons were "suffering from . . . drug addiction and [had] failed to successfully complete . . . drug treatment." The court found that CPS had presented "conclusive proof" that "establish[ed] the continuing addiction of both parents as a ground of termination." The court also found that reunification was not desirable toward a satisfactory permanency outcome because "the issue here is permanency for these children, sustained permanency," and the court ruled that reunification was not in their best interest "because their lives have been riddled to date with their parents on going [sic] addiction and now in over three years the parents [had] not shown . . . that a drug free home [could] be sustained."

¶33.    The youth court issued a judgment terminating the Hansons' parental rights.

*Post-Judgment Proceedings*

¶34.    The Hansons appealed the youth court's judgment in June 2023. After the appellate

11

briefing schedule had been established, the Hansons filed a Rule 60 motion[3] in the youth court in March 2024. CPS moved for dismissal, so the Hansons filed a motion with the Mississippi Supreme Court to allow them to file the Rule 60 motion. While this motion was pending in the Supreme Court, the parties continued their briefing, and the appeal was assigned to this Court. Although the case was assigned to this Court, the Supreme Court granted the Hansons' motion, allowing them to file their Rule 60 motion in the trial court.

¶35. The youth court held a hearing on the motion but ultimately determined that there were no "extraordinary or compelling circumstances" to warrant overturning the original judgment. The court also found that the Hansons' efforts to relitigate some of the issues were inappropriate. The court denied the Rule 60 motion. On our own motion, we ordered the parties to file supplemental briefs addressing "any issues they [sought] to be considered" after the youth court's denial of the Rule 60 motion.

**ANALYSIS**

¶36. "The standard of review and statutory basis for termination of parental rights is quite limited." *A.H. v. K.M.*, 323 So. 3d 509, 513 (¶22) (Miss. 2021). This Court "will not disturb the [judge's] opinion when supported by substantial evidence unless the [judge] abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Samples v. Davis*, 904 So. 2d 1061, 1064 (¶9) (Miss. 2004). Under this standard of review, if "credible proof exists to support the judge's findings of fact by clear and convincing evidence," we will affirm. *S.F. v. Lamar Cnty. Dep't of Child Prot. Servs. ex rel.*

---

[3] M.R.C.P. 60.

*Davenport*, 373 So. 3d 985, 987 (¶8) (Miss. 2023) (internal quotation marks omitted).

**I.      The youth court's decision is supported by substantial credible evidence.**

**A.      CPS's Diligent Assistance to Comply**

¶37.    The Hansons argue that the youth court failed to follow section 93-15-115 because there was not clear and convincing evidence that CPS "made reasonable efforts . . . to diligently assist" them in complying with the service plan. Specifically, they claim that CPS's failure to help Elizabeth get a recovery sponsor shows that there was no diligent assistance.

¶38.    Under section 93-15-115, if reasonable efforts for reunification are required for a child in CPS custody or under CPS supervision, the youth court "may terminate the parental rights of a parent" after an evidentiary hearing if the court finds the following by clear and convincing evidence:

(a) The child has been adjudicated abused or neglected;

(b) The child has been in the custody and care of, or under the supervision of, [CPS] for at least six (6) months, and, in that time period, [CPS] has developed a service plan for the reunification of the parent and the child;

(c) A permanency hearing, or a permanency review hearing, has been conducted pursuant to the Uniform Rules of Youth Court Practice and the court has found that [CPS], or a licensed child caring agency under its supervision, has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child; and

(d) Termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121.

13

Miss. Code Ann. § 93-15-115.

¶39. Although the youth court's judgment does not devote a significant amount of time to discussing CPS's reasonable efforts, the court noted that CPS developed a plan and that the court and CPS "diligent[ly] worked with this family through three failed trial home placements to place the children . . . back in their parents' custody." The youth court also found that the Hansons "were given every opportunity plus many more to provide a drug free home for their children."

¶40. These findings are supported by substantial credible evidence. Exhibits and testimony from Walker, the GAL, and the Hansons all show that CPS created service plans for three years with the intent to help the Hansons reunify with their children. Walker testified that CPS had assisted Elizabeth in seeking inpatient rehabilitation and had encouraged both parents to attend recovery meetings. Walker also testified that CPS had gone "above and beyond" to help the Hansons achieve reunification. The Hansons' claim that CPS was required to find Elizabeth a sponsor in order to comply with the "reasonable efforts" requirement of the statute is unfounded.

**B.    Grounds for Termination**

¶41. The Hansons argue that CPS did not prove the statutory grounds for termination by clear and convincing evidence. They claim that they "passed a majority of the drug tests they have taken" and that they were cooperative for all drug test requests. They also argue that there is no evidence Jack failed to successfully complete treatment or that he was ever ordered into drug rehabilitation or treatment as part of a service plan. They further argue that

Elizabeth attended drug treatment twice and successfully completed it and that her relapses do not mean she did not comply with a service plan. They also argue that neither CPS nor the GAL had any issue with their provision of food, clothing, shelter, or medical care for the children.[4]

¶42. Section 93-15-115 allows termination of parental rights based on the grounds set out in either section 93-15-119 or section 93-15-121 if any of the reasons are established "by clear and convincing evidence" and if the court finds that "reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome." Miss. Code Ann. §§ 93-15-119, 93-15-121. Although the statutes provide several different reasons for termination, only one statutory ground is needed to justify termination of parental rights. *See Bullock v. Miss. Dep't of Child Prot. Servs.*, 343 So. 3d 1079, 1086 (¶22) (Miss. Ct. App. 2022).

### 1.    *Section 93-15-121*

¶43. Section 93-15-121 provides ten grounds for termination of parental rights, but only one is relevant here, subsection (c), which states that termination may be appropriate if "the parent is suffering from habitual alcoholism or other drug addiction and has failed to successfully complete alcohol or drug treatment." Miss. Code Ann. § 93-15-121(c).

---

[4] This argument appears to be a reference to section 93-15-121(d), which provides that termination may be appropriate if "[t]he parent is unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the child . . . ." Although CPS raised subsection (d) in its petition for termination, the youth court did not address it when finding grounds for termination. The youth court's judgment is clear that the Hansons' continued drug addiction and inability to provide their children with a safe, drug-free home was the basis for termination.

¶44. The youth court found that "the conclusive proof . . . establishing the continuing addiction of both parents" was grounds for terminating their parental rights. The record shows that the court heard clear and convincing evidence that the Hansons suffered from habitual drug addiction and were unable to successfully complete treatment. Jaden tested positive for cocaine at birth, and Elizabeth admitted using cocaine during her pregnancy. Over the three years that the children were in CPS custody, both Jack and Elizabeth tested positive for drugs at various times, sometimes showing increased drug use during times when they had the children through a temporary home placement. The children also tested positive twice during this time, and Elizabeth admitted to using drugs around the children. Though Jack claims that he never had a drug problem—which his positive test results belie—he admitted that he knew Elizabeth was using drugs and using them around the children, and he testified that he could not put the children's well-being above his wife's.

¶45. The Hansons' behavior and testimony showed that they could not and would not change their actions to provide a safe, stable environment for their children. The youth court's findings are supported by substantial credible evidence.

### 2. Section 93-15-119

¶46. Although the Hansons do not address it, the youth court also found grounds to terminate their parental rights under section 93-15-119, which provides for termination of parental rights when "the court finds by clear and convincing evidence . . . [t]hat the parent has engaged in conduct constituting abandonment or desertion of the child . . . ." Miss. Code Ann. § 93-15-119(1)(a)(i). The court must also find that "termination of the parent's parental

rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome." Miss. Code Ann. § 93-15-119(1)(a)(ii).

¶47. The youth court found that the Hansons had abandoned their children through their drug use. Specifically, the court noted that the children had not consistently lived with their parents for over three years and that Jaden had never lived with them at all, since he tested positive for cocaine at his birth. The court also noted that "the parents' drug use was conclusively shown to be the reason that reunification could not occur." The court found that the Hansons had no "intention of establishing a lasting drug-free home" for their children, and that this was effectively abandonment.[5]

¶48. The court applied "the same logic" to the facts and found that the Hansons' behavior also could be considered desertion.[6] The court noted that the Hansons had over forty-three months to turn their lives around and complete the service plan, and their failure to do so was a willful neglect to provide for the support and maintenance of the children. The court rejected their "last-ditch efforts" to provide clean drug tests. The Hansons do not challenge the court's findings on this point.

¶49. As discussed, the youth court's finding that the Hansons' parental rights should be

---

[5] "'Abandonment' means any conduct by the parent, whether consisting of a single incident or actions over an extended period of time, that evinces a settled purpose to relinquish all parental claims and responsibilities to the child." Miss. Code Ann. § 93-15-103(a) (Supp. 2023).

[6] "'Desertion' means . . . [a]ny conduct by the parent over an extended period of time that demonstrates a willful neglect or refusal to provide for the support and maintenance of the child." Miss. Code Ann. § 93-15-103(d)(i).

terminated under section 93-15-121 were supported by clear and convincing evidence. We additionally find that the youth court's findings under section 93-15-119 were also supported by clear and convincing evidence. Because either statute provided sufficient grounds to terminate the Hansons' parental rights, the youth court's decision is affirmed.

### 3. *"Reunification is not desirable toward a satisfactory permanency outcome."*

¶50. The Hansons claim that the court erred by not finding that reunification was not desirable toward obtaining a satisfactory outcome before it considered termination under section 93-15-121. The Hansons cite no caselaw to support their argument that this must be done *before* considering grounds for termination under section 93-15-121. The Hansons argue generally that there was no evidence that reunification was not desirable, but the youth court found otherwise.

¶51. The court specifically found that CPS met its burden to show that reunification was not desirable toward obtaining a satisfactory permanency outcome "based on the proof that the parents' conduct has been such that they have not nor do not have any intention of establishing a lasting drug free home." The court noted that there were several failed trial home placements, some of which resulted in the children testing positive for drug exposure, and that both parents showed "extended drug use" over the three years CPS had custody of their children. The record supports this finding.

## II. The youth court's denial of the Hansons' Rule 60 motion was not erroneous.

¶52. The Hansons argued in their Rule 60 motion that the GAL failed to zealously

18

represent the children's best interests, and at the hearing on the motion, they suggested that there were issues with the accuracy of the drug testing used. CPS noted that the Hansons had not raised concerns with the drug testing in their motion, and CPS argued that the Rule 60 motion was not filed in a reasonable time and did not present any extraordinary reason that the Hansons were entitled to relief.

¶53. The GAL testified at the hearing that she had not interviewed Jaden and Xane because they were too young, and she maintained that she had been heavily and thoroughly involved in the case. The court found that there were no "compelling circumstances" to warrant overturning the original judgment and that the Hansons were trying to relitigate other issues, which was not a proper basis for Rule 60 relief. The court denied the Hansons' motion.

¶54. Generally, we review the denial of a Rule 60(b) motion for an abuse of discretion. *Smith v. Doe*, 268 So. 3d 457, 461 (¶8) (Miss. 2018). Under Rule 60(b), a party can seek relief from a judgment for the following reasons:

> (1) fraud, misrepresentation, or other misconduct of the adverse party;
>
> (2) accident or mistake;
>
> (3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;
>
> (6) any other reason justifying relief from the judgment.

M.R.C.P. 60(b). "[A] Rule 60 motion does not concern the merits of the underlying claim,

only whether the movant is entitled to relief from the judgment for one of the limited grounds permitted by the rule." *In re Est. of Wylie*, 226 So. 3d 114, 120 (¶16) (Miss. Ct. App. 2017). Additionally, "Rule 60(b) is not an escape hatch for litigants who had procedural opportunities afforded under other rules and who without cause failed to pursue those procedural remedies." *City of Jackson v. Jackson Oaks Ltd. P'ship*, 792 So. 2d 983, 986 (¶5) (Miss. 2001). A motion for relief under Rule 60(b) "should be denied where it is merely an attempt to relitigate a case." *McNeese v. McNeese*, 119 So. 3d 264, 272 (¶20) (Miss. 2013).

¶55. In their supplemental brief to this Court, the Hansons do not claim that the youth court erred by denying their Rule 60 motion. Instead, they argue again that the GAL failed to protect the children's best interests, specifically noting that the GAL did not interview the children, their foster parents, or the children's doctors. They argue that the GAL did not provide any information regarding the children's health, education, or general welfare.

¶56. To begin, this does not address the grounds for relief laid out in Rule 60 and appears to be a blatant attempt to relitigate the case. For this reason alone, the youth court did not err in denying the Rule 60 motion.

¶57. But to address the Hansons' arguments against the GAL, we recently noted in *Chitwood v. Stone County Department of Child Protection Services*, 364 So. 3d 644 (Miss. Ct. App. 2020),

> The Mississippi Termination of Parental Rights Law "requires that a [GAL] shall be appointed to protect the interest of the child in the termination of parental rights." *M.J.S.H.S. v. Yalobusha Cnty. Dep't of Human Servs.*, 782 So. 2d 737, 740 (¶14) (Miss. 2001) (emphasis omitted); *see* Miss. Code Ann. § 93-15-107(1)(d) (Supp. 2017). "Our case law states that guardians ad litem do not have an option to perform or not perform, rather they have an

20

affirmative duty to zealously represent the child's best interest." *M.J.S.H.S.*, 782 So. 2d at 740 (¶14); *see also Barber v. Barber*, 288 So. 3d 325, 331 (¶26) (Miss. 2020) (stating that "guardians ad litem serve [an] important [role] as 'appointed investigators for, or advisors to, the court,' and, as authorized, 'the [GAL] should recommend a course of action to the court'" (quoting *S.G. v. D.C.*, 13 So. 3d 269, 282 (¶56) (Miss. 2009))).

*Id.* at 648 (¶12).

¶58. We first note that the Hansons' arguments against the GAL are refuted by the record. The GAL testified that she had reviewed all court and CPS filings, and her testimony showed that she was familiar with the Hansons' multiple failed drug tests and the children's positive drug results. She admitted that the Hansons were adequate parents in nearly every respect except for their inability to remain drug-free and ensure that their children could live in a drug-free environment. The GAL's testimony was supported by other evidence in the record, and we cannot say that there is any evidence that the GAL failed in her "affirmative duty to zealously represent the child's best interest." *M.J.S.H.S.*, 782 So. 2d at 740 (¶14).

¶59. The Hansons also argue in their supplemental brief that the youth court's decision was not based on clear and convincing evidence. They raise no argument in the supplemental brief different than those already raised in their initial brief. As addressed, the youth court's decision was supported by clear and convincing evidence, and this argument is merely an attempt to relitigate the case.

¶60. The other issues noted by the Hansons in their supplemental brief are not supported by any argument or authority, and we will not address them. "The failure to cite authority in support of an argument eliminates our obligation to review the issue." *Glasper v. State*, 914 So. 2d 708, 726 (¶40) (Miss. 2005).

**CONCLUSION**

¶61. Although "[p]arents have a 'fundamental liberty interest in the care, custody, and management of their child,'" that right may be terminated when there is "'clear and convincing evidence of the required statutory grounds for termination of parental rights.'" *Chism v. Bright*, 152 So. 3d 318, 322 (¶13) (Miss. 2014) (quoting *Santosky v. Kramer*, 455 U.S. 745, 754 (1982)). Here, the youth court found clear and convincing evidence to support termination of the Hansons' parental rights and that termination was in the children's best interest. The record contains substantial credible evidence to support that finding, and we affirm the termination of the Hansons' parental rights.

¶62. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR.**